IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CURTIS WAYNE TAYLOR,

                    Petitioner,

        vs.

WILLIAM MUNIZ, Acting Warden,
Salinas Valley State Prison,[1]

                Respondent.

No. 2:13-cv-01826-JKS

MEMORANDUM DECISION

Curtis Wayne Taylor, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Taylor is in the custody of the California Department of Corrections and incarcerated at Salinas Valley State Prison. Respondent has answered, and Taylor has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On February 14, 2007, Taylor was charged in information number 07-01047 with possession of methamphetamine and resisting arrest. That information further alleged that Taylor had suffered a prior strike conviction and had served two prior prison terms. Taylor was arraigned on information number 07-01047 on February 14, 2007, entered a not guilty plea, denied the prior conviction and prison term allegations, and was subsequently released on bail.

On November 30, 2009, Taylor and his co-defendant Beau Houston Gray were charged in information number 08-05142 with murdering (count 1), torturing (count 2), and assaulting (count 3) Travis Smith. With regard to count 1, the information alleged a torture murder special

---

[1]      William Muniz is substituted for the Randy Grounds as Warden of Salinas Valley State Prison. Fᴇᴅ. R. Cɪᴠ. P. 25(d).

circumstance.  The information additionally alleged that Taylor and Gray had personally inflicted great bodily injury with respect to count 2 and that count 3 constituted a "serious felony" due to the fact that such injury had been inflicted.  The information further alleged that Taylor had committed the charged offenses after being released on bail in case number 07-01047 and again alleged the prior conviction and prison terms allegations tied to that case.  On direct appeal of his conviction, the Court of Appeal recounted the following facts underlying the charges against Taylor:

> On June 8, 2008, defendants spent the day drinking alcohol and smoking marijuana at the Shady Oaks Mobile Home Park with 14–year old T.D., 18–year old Tabitha Bigger, Shane Venzke, and others.
>
> At some point T.D. left with the victim Smith, who was "extremely drunk," and two others to get more alcohol.  According to T.D., Smith touched her "butt" as she was getting into the car and, once inside, touched her hand and told her she was pretty.  Word of Smith's alleged touching quickly spread throughout the trailer park.
>
> After returning from the store, Smith went to the home of Jimmy Jones, who also lived in the trailer park, and told Jones that "[t]hose people down at the trailer park think I touched that little girl."  Jones asked Smith whether he had touched her, and Smith said, "No."  Smith purchased some methamphetamine from a woman at Jones' home and snorted a line or so that night.
>
> Later that evening, Jones and Smith were approached by defendants as they walked along a canal near the trailer park. T.D., Venzke, and Bigger were also present. Taylor punched Smith in the face, and Smith fell to the ground, striking his head.  While Smith was on the ground, Gray stomped on his head.  Jones asked Taylor why he attacked Smith, and Taylor said it was because Smith was a child molester.  Defendants left Smith unconscious and bleeding, returned to the trailer park, and continued partying.
>
> Less than an hour later, defendants returned to Smith, who remained on the ground where he had been beaten.  Taylor asked Smith whether he was going to touch little girls again, and Smith said, "Yeah."  Taylor then slapped him.  Taylor again asked Smith whether he was going to touch little girls, and Smith said, "Fuck yeah."  Taylor then punched or kicked Smith, while Gray stomped on his head "really hard" with the entire weight of his body.  Defendants emptied Smith's pockets, taking his wallet, marijuana, methamphetamine, and possibly a ring.  Defendants left Smith unconscious and went to Jones' home.  They had methamphetamine when they arrived.  Jones tasted the methamphetamine and identified it as the same methamphetamine his friend sold to Smith earlier that evening.
>
> Approximately 20 minutes later, defendants again returned to Smith.  As Smith attempted to move, Taylor began punching him in the face, while Gray stomped on his

head and chest.  Smith pleaded with defendants to stop.  When defendants were finished, Smith was barely able to speak.  Taylor urinated on his head.

Defendants told T.D. and Bigger not to call an ambulance or 911 and not to tell the police anything about defendants' involvement if questioned.  If they did, Taylor said "he would know who did it and something would be done."  Taylor asked Gray to take Smith home so he did not die where he lay, and Gray told Taylor that Smith "could lay there and die for all he cared."

Early the next morning, T.D. walked by the scene of the beatings, and Smith remained there unconscious.  Defendants also were there.  Taylor was cleaning off the fence near where the beatings took place, while Gray stood around.  At approximately 6:30 a.m., a mountain biker saw Smith and asked a resident of the trailer park to call for help.

Ten to fifteen minutes later, a Redding police officer arrived and found Smith unconscious next to the fence.  Smith's eye was swollen and discolored, and he had blood running from his nose.  Smith told the officer he had fallen during the night and injured himself.  Smith smelled like alcohol and had trouble standing.  The officer called an ambulance, and Smith was taken to the hospital.

Smith was diagnosed with a traumatic brain injury and was placed in the hospital's intensive care unit.  He had multiple intracerebral contusions and an "altered level of consciousness."  He also appeared to be suffering from acute alcohol withdrawal. He remained in the hospital for eight days.  When he was released on June 16, 2008, his discharge papers did not say that he should refrain from consuming alcohol; however, Dr. Ashok Jain, the consulting neurosurgeon on Smith's case, told Smith and Smith's sister that Smith should not consume alcohol or take any medication without Dr. Jain's knowledge.

After being released, Smith stayed with his sister.  He was unusually quiet, complained that his head hurt, and said he wanted to lie down.  His wife visited him at his sister's home on June 17, 2008, the day after he was released from the hospital. Smith told her that he "wanted to go into a rehab because he was going to die if he continued to drink . . . ."  He also complained of pain in his head.  Smith was unusually quiet during her visit.

Later that evening, Smith drank beer with a friend, who observed that Smith "wasn't himself."  Smith "collapsed, fell down" on his way to the restroom.  He was not finishing his sentences and was jumping from topic to topic.  He also appeared pale.  His friend left around 9:00 or 10:00 p.m.  Smith's sister's boyfriend last saw Smith at 11:30 p.m.; he was the last person to see Smith alive.  Smith's sister discovered Smith's body the following morning, June 18, 2008, at approximately 7:00 a.m.  There were several empty 12–ounce beer cars and three empty 32–ounce beer cans near Smith's body.

Later that day Gray was interviewed by Officer Todd Cogle of the Redding Police Department.  When asked what he was doing on June 8, 2008, before Smith was assaulted, Gray said he was drinking in the trailer park with a couple of "chicks" when Smith walked through, and one of the "chicks" started "freaking out," saying that Smith had molested her.  Gray asked Smith if he was going to stop touching little girls.  Gray initially said that Smith pulled out a knife and attempted to cut him, and that he kicked

Smith in the head.  Later, Gray acknowledged Smith did not pull a knife on him and confirmed that when Smith attempted to get up, Gray kicked him back down. Gray said that Smith was "hurting" but still talking when Gray left.  Gray returned to Smith two or three times during the course of the night, and Smith was beaten each time.  After Gray returned the second time, Smith was badly beaten; he had blood coming out of his nose and mouth, and his eyes were so swollen he could not see out of them.  Gray said Smith received 100 blows over the course of the evening but later gave different estimates.

Dr. Susan Comfort, a forensic pathologist with the Shasta County Sheriff's Coroner System, performed a postmortem examination of Smith's body hours after it was discovered.  She found several skull fractures.  "[T]he largest and most impressive fracture was in . . . the back of the head.  It was slightly depressed, meaning the bone was actually pushed with enough force that it bent inwards, and radiating from a point of impact on that left area were three fractures, which then coursed into separate areas of the skull, one more towards the front, and the other two more towards the back of the head." She also found a separate fracture on the left side of the temporal region, which "ran down and intersected [with the] . . . fractures that were in the back of the head."  The fracture on the back of Smith's head was consistent with a very hard blow or falling backward and hitting the ground.  The fracture on the left side was consistent with a kick to the head.  Dr. Comfort also observed multiple contusions on the brain that corresponded to the fractures.

After performing the physical examination but before receiving the toxicologist's report, Dr. Comfort cautioned Officer Cogle that Smith may have died as a result of methamphetamine poisoning, alcohol poisoning, or a mixture of the two.  In addition to the head trauma, she found ischemic bowel changes, which can be caused by methamphetamine use.  She advised Officer Cogle that it would be "pretty risky" to charge anyone with Smith's murder before she made her official ruling on the cause of death.  She explained that "if we get the tox back and he's got methamphetamine and alcohol, then I'm going to be ruling it as an accidental drug, mixed drug and alcohol intoxication."  When asked what her opinion as to the cause of death would be "if the tox comes back clean or with just alcohol on board," Dr. Comfort responded, "Well then, we're only left with head injuries."

The toxicology report indicated that Smith's blood alcohol level was .14, which is equivalent to consuming seven beers.  He also had a very low level of Fentanyl,[FN4] which had not been prescribed, in his system.  Alcohol and Fentanyl reduce blood flow to the brain and could have been fatal to someone with Smith's injuries.  No methamphetamine was found.  Dr. Comfort opined that Smith's death was caused by blunt force injuries to the head, and that alcohol and Fentanyl intoxication were contributing factors.  She concluded that blunt force trauma was a substantial cause of Smith's death, and that he would not have died had he not been so severely beaten 10 days earlier.

FN4. Fentanyl is a narcotic analgesic that is used for pain and as a sedative.

Dr. Comfort estimated that Smith died around midnight on June 17, 2008.  She based her estimate on the investigator's observation of rigor in Smith's arms, legs, and

jaw at approximately 7:00 a.m. the following morning.  Smith's state of rigor indicated he had been deceased for approximately eight hours.  Once a person is deceased, his or her body stops metabolizing alcohol.

Two CAT scans were taken of Smith's head upon his arrival at the hospital; neither revealed a skull fracture.  Dr. Noel Curcio, one of Smith's treating physicians, believed it was possible that the skull fractures observed by Dr. Comfort were missed but thought it was more likely that the fractures were received after Smith was discharged.  He acknowledged that Smith's injuries were consistent with a skull fracture, and that a person with severe injuries like those discovered during the autopsy could succumb to those injuries days or weeks after they were inflicted.

Dr. Jain also believed that it was unlikely the radiologists who interpreted Smith's CAT scans missed any fractures.  Had Smith suffered the fractures prior to being released, Dr. Jain doubted that Smith's clinical condition would have been as good as it was.  Dr. Jain would not be surprised to find skull fractures in a person who had suffered the multiple traumatic injuries to the brain that Smith had.  He would "probably disagree" with Dr. Comfort's finding that the cause of death was blunt force trauma sustained 10 days before Smith's death because Smith's clinical condition was very good at the time he was discharged, and Dr. Jain had never seen that happen before.

The fact that the skull fractures were not observed on the CAT scans did not alter Dr. Comfort's opinion that the fractures were caused at the same time as the brain contusions.  She based her opinion on the fact that the skull fractures corresponded to the locations of the brain contusions, and the absence of any fresh trauma to the brain or injury to the scalp.  She explained that with "a very thin hairline fracture such as what you see here . . . and also when it's fresh . . . it's very easy not to see it on an imaging scan . . . ."  When she shared her findings with one of the radiologists that reviewed the CAT scans, he was not surprised that she found a fracture he did not and "said sometimes when the fractures are located down at the bottom of the skull or base of the skull is an area that is harder to scan, and sometimes it's easy to miss a fracture, especially if it's not displaced and just a simple hairline fracture."  Dr. Comfort further explained that if the fractures were caused by a fall after Smith was released from the hospital, she would expect to find corresponding fresh trauma to the brain or fresh injury to the scalp, which she did not.  Instead, she observed "some early signs of healing" that were consistent with the injuries being 10 days old.

Dr. Paul Herrmann, a forensic pathologist called by Taylor, opined that Smith "died as a result of a combination of injuries to his brain and also Fentanyl and alcohol intoxication."  Had Smith not used alcohol or Fentanyl, it is unlikely he would have died when he did.  Similarly, if Smith had not suffered the brain injuries as a result of defendants' attack, "the Fentanyl and alcohol would not have killed him."

Defendants did not dispute assaulting Smith.  Rather, during closing arguments Taylor's counsel conceded: "As far as the assault, at least as far as my client is concerned, he definitely assaulted Travis Smith.  There's no doubt about that.  And there's no doubt that in my mind that Travis Smith suffered something."  Gray's counsel likewise acknowledged that "there was an assault here, and certainly there was great bodily injury that was done here."  Defendants did, however, dispute that they had the

requisite intent for murder and urged that Smith died as a result of his own actions following his release from the hospital, and not as a result of the assault.

*People v. Taylor*, No. C064852, 2012 WL 928244, *2-5 (Cal. Ct. App. Mar. 19, 2012).

Taylor and Gray proceeded to a joint jury trial on December 10, 2009.  On January 21, 2010, the jury found both defendants guilty of second-degree murder (count 1) and assault with force likely to cause great bodily injury (count 3) and also found true the allegation that they had inflicted great bodily injury during the commission of the offense.  The jury found the defendants not guilty of first-degree murder and torture and found the torture/murder special circumstance allegation not true.

After he waived a jury trial on the prior convictions, bail, and prison term allegations, the trial court held a bench trial and found true the allegations that Taylor had suffered a prior strike conviction, served two prison terms, and been released on bail when he committed the murder and assault.  Gray then moved for a new trial, which Taylor joined.  Taylor also asked the court to dismiss his prior strike conviction pursuant to *People v. Superior Court (Romero)*, 917 P.2d 628 (Cal. 1996).[2]  The trial court denied both motions.

Taylor also agreed to plead no contest to the possession of methamphetamine charge in information number 07-01047 and admit that he was on bail in that case when the incident underlying the charges in information number 08-05142 occurred.  In exchange, the remaining

---

[2]        Under California Penal Law § 1385, a California court may dismiss a defendant's "strike" conviction for purposes of sentencing under the state's Three Strikes law; a motion for such dismissal is referred to as a "*Romero*" motion based on the state supreme court's decision in that case.  *Romero*, 917 P.2d at 632.  A trial court's failure to dismiss or strike a prior conviction is reviewed for abuse of discretion.  *People v. Carmony*, 92 P.3d 369, 374 (Cal. 2004).  "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."  *Id*. at 377.

count and prior conviction and prison term allegations in information number 07-01047 would be dismissed, and he would be sentenced to an additional and consecutive 8-month term of imprisonment.  The trial court subsequently sentenced Taylor to a determinate term of 12 years and 8 months' imprisonment, plus an indeterminate term of 30 years to life, calculated as follows: 4 years on count 3, doubled to 8 years because of the prior strike conviction, plus a consecutive term of 2 years on the bail allegation, plus a consecutive year-term for each prior prison term allegation (2 years total), plus a consecutive term of 8 months in case 07-01047, along with 15 years to life on count 1, doubled to 30 years to life because of the prior strike conviction.[3]

Through counsel, Taylor appealed his conviction, arguing that: 1) the admission of Gray's statement to law enforcement violated his rights under *Aranda/Bruton*;[4] 2) the trial court committed reversible error by failing to instruct the jury on independent intervening causation; 3) the trial court likewise erred in failing to instruct on unanimity; 4) the prosecutor committed misconduct during closing argument by misleading the jury about "proof beyond a reasonable doubt;" 5) there was insufficient evidence to support the court's finding that Taylor suffered a prior strike conviction; 6) trial counsel was ineffective for a variety of reasons; and 7) the trial

---

[3]     Gray was sentenced to a determinate term of 4 years' imprisonment plus an indeterminate term of 15 years to life.

[4]     *See People v. Aranda*, 407 P.2d 265 (Cal. 1965) (finding that admission of confession implicating co-defendant in joint trial resulted in miscarriage of justice notwithstanding instruction that confession was admissible only against confessing defendant); *see also Bruton v. United States*, 391 U.S. 123 (1968) (finding that admission of confession implicating co-defendant in joint trial constituted prejudicial error even under circumstances in which trial court gave clear jury instruction that confession could only be used against confessing defendant and must be disregarded with respect to co-defendant).

court should have stayed his sentence on the assault charge pursuant to California Penal Code § 654.[5]  On March 19, 2012, the Court of Appeal issued a reasoned, unpublished opinion in which it agreed that the trial court erred in refusing to stay Taylor's sentence for assault with force likely to cause great bodily injury and modified his judgment accordingly.  *Taylor*, 2012 WL 928244, at *1.  The Court of Appeal affirmed Taylor's judgment in all other respects.  *Id.*

Taylor sought rehearing on the grounds that the Court of Appeal's opinion omitted and misstated material facts and failed to address material issues.  The Court of Appeal summarily denied the rehearing petition.  Taylor then timely petitioned for review in the California Supreme Court, raising his *Aranda/Bruton*, instructional error, and prosecutorial misconduct claims.  The Supreme Court denied review without comment on June 13, 2012.

Taylor then filed in the California Supreme Court a *pro se* petition for habeas relief dated September 4, 2013.  In his state habeas petition, Taylor alleged that trial counsel was ineffective for: 1) failing to object to the alleged *Aranda/Bruton* violation; 2) failing to investigate Taylor's alibi defense; 3) failing to object and request an admonition regarding the prosecutor's alleged misstatement during closing argument of the reasonable doubt standard; 4) stipulating to a prejudicial "Statement of the Case"; 5) failing to object to the prosecution's definition of voluntary manslaughter during opening and closing arguments; 6) denying Taylor the right to testify on his own behalf; and 7) failing to request a jury instruction on superseding intervening

---

[5]        Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  CAL. PENAL CODE § 654.

causation or request clarification of the instructions actually given.  The Supreme Court

summarily denied the state habeas petition on December 18, 2013.

The same day he filed his state habeas petition, Taylor also filed in this Court a timely

*pro se* Petition for a Writ of Habeas Corpus, which has now been fully briefed and is ready for

final adjudication.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Taylor raises nine grounds for relief.  First,

Taylor argues that the trial court had a sua sponte duty to instruct on superceding intervening

causation (ground 1).  He also argues that the Court of Appeal erred in concluding that the

*Aranda/Bruton* error was harmless (ground 2).  Finally, he alleges that trial counsel was

ineffective for: failing to object to the *Aranda/Bruton* error (ground 3); failing to investigate his

alibi defense (ground 4); failing to object to the prosecutor's misstatement regarding the

reasonable doubt standard (ground 5); stipulating to a prejudicial "Statement of the Case"

(ground 6); failing to object to the prosecution's definition of voluntary manslaughter (ground

7); denying Taylor the right to testify on his own behalf (ground 8); and failing to request an

instruction of superceding intervening causation or seek clarification of the instructions actually

given (ground 9).  Taylor also requests an evidentiary hearing as to all his claims.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"
§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that
contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that
are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives
at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)
"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the
relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon
the states; that is, the decision must be based upon constitutional grounds, not on the supervisory
power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where
holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it
cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"
*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are
beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.
Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was
correctly applied).  It is a fundamental precept of dual federalism that the states possess primary
authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,
67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and
application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state
court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536
U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Taylor has not replied to Respondent's answer.  The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

A.    *Trial Court's Failure to Sua Sponte Instruct the Jury on Superceding Intervening Causation* (Ground 1)

Taylor first argues that the trial court committed reversible error when it failed to *sua sponte* instruct the jury on superceding intervening causation.  In support of this claim, Taylor asserts:

> The assault victim in my case was taken to the hospital and released 8 days later. Two days after that he died after drinking ten beers, ingesting the opiate Fentanyl that was not pr[e]scribed to him, and falling down from being drunk.  Dr. Curcio, Dr. Jain and Dr. Hermann opined at trial that the fatal depressed skull fracture was new and most likely the result of a fall after the victim was released from the hospital because the CT scans taken at the hospital had revealed nothing when he was released.  This was supported by the testimony of Mr. Cromp who stated that on the night of the victim[']s

death, the victim fell down from being drunk and had to be carried to the bathroom.  Dr. Comfort testified that [the] death could have been due to an extrinsic intervening factor such as alcohol ingestion aggravating the underlying head injury and compromising blood flow to the brain, which could have caused him to die from injuries he otherwise would have survived.  The jury instructions given in my case[] only required the jury to find that my actions in the earlier assault were a substantial factor in placing the victim at risk.  Under those instructions any superceding intervening cause would be deemed irrelevant.

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380 (1990).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471 U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record.  *Estelle*, 502 U.S. at 72.  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn.  *Id.* at 72-73.  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation."  *Id*. at 73 (citation omitted).

Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *Id.* at 156-57; *Estelle*, 502 U.S. at 72.

Under California law, "[i]n criminal prosecutions, the contributing negligence of the victim or a third party does not relieve the criminal actor of liability, unless the victim's or third party's conduct was the sole or superseding cause of the death." *People v. Autry*, 43 Cal. Rptr. 2d 135, 139 (Cal. 1995). "An independent intervening act is a superseding cause relieving the actor of liability for his negligence only if the intervening act is highly unusual or extraordinary and hence not reasonably foreseeable." *Lombardo v. Huysentruyt*, 110 Cal. Rptr. 2d 691, 699 (Cal. Ct. App. 2001); *see also People v. Schmies*, 51 Cal. Rptr. 2d 185, 194 (Cal. Ct. App. 1996) (stating that there may be a superseding cause of death only where the third party's conduct was "so unusual, abnormal, or extraordinary that it could have not been foreseen"); *People v. Armitage*, 239 Cal. Rptr. 515, 525 (Cal. Ct. App. 1987) ("[I]t is only an unforeseeable intervening cause, an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause.").

The California Court of Appeal rejected Taylor's claim that the trial court failed to *sua sponte* instruct the jury on superseding cause, stating, "While we agree with defendants that causation instructions were required under the facts of this case; we do not agree that the instructions given by the trial court here were lacking." *Taylor*, 2012 WL 928244, at *10. It reasoned:

The trial court instructed the jury in the language of CALCRIM No. 240 (Causation) as follows: "An act causes injury or death if the injury or death is the direct, natural, and probable consequence of the act and the injury or death would not have happened without the act.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

"There may be more than one cause of injury or death.  An act causes injury or death only if it is a substantial factor in causing the injury or death.  A substantial factor is more than a trivial or remote factor.  However, it does not have to be the only factor that causes the injury or death."[FN7]  CALCRIM No. 240 "correctly indicates, in essence, that liability would not be cut off for an intervening act if the victim's death was nevertheless a 'direct, natural, and probable consequence' of defendant's original act." (*People v. Fiu* (2008) 165 Cal.App.4th 360, 372.)  The language of CALCRIM No. 240 "requiring an injury or death to be a direct, natural and probable consequence of a defendant's act necessarily refers to consequences that are reasonably foreseeable." (*Ibid.*)  Moreover, CALCRIM No. 240 defines a "natural and probable consequence" as "one that a reasonable person would know is likely to happen if nothing unusual intervenes."  Further, while explaining that there may be more than one cause of death, CALCRIM No. 240 specifies that an act causes death "only if it is a substantial factor in causing . . . the death", and provides that a substantial factor "is more than a trivial or remote factor."  By instructing the jury in the language of CALCRIM No. 240, the trial court implicitly instructed on the principle of independent intervening causation. (See *id.* at pp. 371–372.)

> FN7.  The jury was also instructed in the language of CALCRIM No. 620 (Causation: Special Issues) as follows: "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death.  A substantial factor is more than a trivial or remote factor.  However, it does not need to be the only factor that causes the death.
>
> "The failure of Travis Smith or another person to use reasonable care may have contributed to the death, but if the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death, even though Travis Smith or another person may have failed to use reasonable care.
>
> "The failure of the doctors or medical staff to use reasonable care in treating Travis Smith may have contributed to the death.  But if the injury inflicted by the defendant was a substantial factor causing the death, then the defendant is legally responsible for the death even though the doctors or medical staff may have failed to use reasonable care.  On the other hand, if the injury inflicted by the defendant was not a substantial factor causing the death, but the death was caused by grossly improper treatment by the doctors or medical staff, then the defendant is not legally responsible for the death.
>
> "Travis Smith may have suffered from an illness or physical condition that made him more likely to die from the injury than the average person.  The fact

that Travis Smith may have been more physically vulnerable is not a defense to
murder.  If the defendant's act was a substantial factor causing the death, then the
defendant is legally responsible for the death.  This is true even if Travis Smith
would have died in a short time as a result of other causes or if another person of
average health would not have died as a result of the defendant's actions.
            "If you have a reasonable doubt whether a defendant's act caused the
death, you must find him not guilty."

*Id*.

The Court finds no basis for disagreeing with the California Court of Appeal's

conclusion that the trial court did not fail to *sua sponte* give the jury an instruction on

superceding cause.  Taylor cannot establish that the omission of an instruction on superceding

cause rendered his trial fundamentally unfair in light of the causation instructions as a whole

because, as the appellate court noted, the jury was instructed on the causation principles relevant

to this case.

Moreover, in either his Petition or his brief on direct appeal, Taylor cites no federal law

compelling the provision of a superceding cause instruction under these circumstances and

indeed cites only state law in support of his claim.  However, "the fact that [an] instruction was

allegedly incorrect under state law is not a basis for habeas relief."  *Estelle*, 502 U.S. at 71-72

(citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does

not permit the federal courts to engage in a finely tuned review of the state evidentiary rules."));

*Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in

order to decide a federal habeas claim, the state's construction of its own law is binding on the

federal court.").  Claims of error in state jury instructions are generally a matter of state law that

do not usually invoke a constitutional question.  *Gilmore v. Taylor*, 508 U.S. 333, 342-43 (1993).

This Court is bound by the state appellate court's determination that the trial court was not

required under California law to *sua sponte* give a superceding cause instruction in the absence

of any due process violation.  Taylor fails to establish a due process violation here because he

may not transform his state instructional error claim into a federal claim by simply asserting a

violation of his constitutional rights.  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (a

petitioner cannot transform a state-law issue into a federal one by simply asserting a due process

violation); *see also Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988) (an instructional

error "does not alone raise a ground cognizable in a federal habeas corpus proceeding") (citation

omitted).

Nor is the Court of Appeal's conclusion that the trial court was not required to *sua sponte*

give a different superceding causation instruction contrary to federal law.  Federal law, like

California law, requires that if a defendant "actually presents and relies upon a theory of defense

at trial," the trial court "must instruct the jury on that theory," even in the absence of a request by

the defendant, if there is a foundation for the defense in the evidence and the law. *United States*

*v. Bear*, 439 F.3d 565, 568 (9th Cir. 2006).  But federal law, much the same as California law,

mandates that a judge is not required to *sua sponte* give a specific instruction where, as here, the

instructions as a whole adequately ensure that the jury is fully instructed on an issue.  *See United*

*States v. Shubaralyan*, 428 F. App'x 685, 686-87 (9th Cir. 2011).[6]

Furthermore, the Court of Appeal alternatively denied Taylor's claim on the additional

ground that "any error in instructing the jury on causation was harmless beyond a reasonable

doubt because no reasonable jury could conclude that [Taylor's] acts were not a concurrent cause

of Smith's death." *Id.* at *11.  It concluded:

---

[6]     Cited for persuasive value pursuant to Ninth Circuit Rule 36-3.

> Smith's actions would relieve [Taylor] of criminal liability only if the jury found that [Taylor's] actions of punching Smith, stomping on his head, leaving him outside overnight, and instructing others not to call for help were not a concurrent cause of Smith's death. . . . Dr. Comfort and Dr. Hermann both testified that Smith died as a result of blunt force trauma to the head, and that Smith's consumption of alcohol and Fentanyl was a contributing factor. On this record, no reasonable jury could have found that [Taylor's] assault was not a concurrent cause of Smith's death.

*Id.*

A claim of jury instruction error is likewise reviewed under a harmless error standard on federal habeas review. *Evanchyk v. Stewart*, 340 F.3d 933, 940-41 (9th Cir. 2003). Habeas relief is only available where the error had a "substantial and injurious effect or influence in determining the jury's verdict" and resulted in "actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008). The relevant question is "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Elofus*, 598 F.3d 1171, 1174 (9th Cir. 2010). A federal court sitting in habeas review must independently "apply the *Brecht* test without regard for the state court's harmlessness determination." *Pulido v. Chromes*, 629 F.3d 1007, 1012 (9th Cir. 2010).

On independent review, the Court likewise concludes that any instructional error was harmless. Taylor has not established any likelihood that he was prejudiced by the instructions or that the jury would have reached a different verdict had it received the charge Taylor now believes to be appropriate. *Brecht*, 507 U.S. at 637. The Court thus finds no basis to believe that Taylor's conviction was the result of an "extreme malfunction" of the state criminal justice system." *Richter*, 562 U.S. at 102. Taylor is therefore not entitled to relief on this ground.

B.      *Aranda/Bruton Error* (Ground 2)

17

Taylor additionally argues that the trial court's admission of codefendant Gray's

extrajudicial statements, which he contends inculpated him in Smith's beating, violated his right

to confront and cross-examine witnesses as Gray did not testify and thus could not be cross-

examined at trial.  The Court of Appeal laid out the following facts underlying this claim:

> Following his arrest, Gray was interviewed by Officer Cogle and made statements inculpating both Taylor and himself in Smith's beating.  During the in limine proceedings, Taylor moved to exclude Gray's statements insofar as they inculpated him in the crimes.  The prosecutor did not object to Taylor's motion so long as he was permitted to "introduce statements of one defendant with regard to strictly what . . . *he did*."  (Italics added.)  The prosecutor explained that he intended to introduce Gray's statements "through testimony with the questions limited to what did Mr. Gray say he did next . . . ."  The trial court agreed that was an appropriate way to proceed and granted Taylor's motion.
>
> At trial, the prosecutor introduced Gray's statements through the testimony of Officer Cogle.  The prosecutor began by asking Officer Cogle whether Gray told "you what his involvement was in the beating of Travis Smith?"  Officer Cogle responded in the affirmative, and the prosecutor asked whether Gray told him "what he was doing on June 8th 2008 before the assault?"  Officer Cogle testified that Gray said he had been drinking beer with a couple of "chicks" when Smith approached, and one of the "chicks" started "freaking out," saying that Smith had molested her.  Gray said he approached Smith, asked Smith if he was going to stop touching little girls, and Smith pulled out a knife and tried to cut Gray.  Gray kicked Smith in the head.  (Gray later admitted that Smith did not pull a knife on him.)  Gray stated that when he left, Smith was hurting but still talking.  Gray told Officer Cogle that he went back to Smith's location two or three times during the course of the evening.  The prosecutor's direct examination of Officer Cogle then proceeded as follows:
>
>> "Q. Okay . . . . [¶] During those two to three times, did Mr. Gray tell you that [Smith] was beaten each of those two or three times?
>> "A. He did.
>> "Q. Did he tell you that [Smith] was urinated on during one of those additional beatings?
>> "A. He did.
>> "Q. Did he tell you the condition of [Smith] after he went back the second time?
>> "A. He described him as being badly beaten with blood coming out of his mouth and nose and collecting on his mustache, that his eyes were swollen shut to the point where he couldn't see out of them.
>> "Q. All right.  Did he give you a total number of blows that [Smith] received during those three times?
>> "A. He estimated at approximately a hundred.

18

"Q. Okay. And did he later modify that number?

"A. He—he gave a couple of different numbers during the interview.

"[¶] . . . [¶]

"Q. During the incident, did he say whether property was taken from Travis Smith?

"A. He did.

"Q. What property did he way was taken?

"A. He said a little bit of marijuana, some methamphetamine, and approximately $5 in cash."

At that point, Gray's counsel objected, arguing that based on the way the last two questions were phrased, jurors would assume that Gray, not Taylor, took the property from Smith, when Gray had told Officer Cogle the opposite was true. Gray's counsel reminded the court that the parties had agreed that Officer Cogle's testimony would be limited to what Gray said he had done. Taylor's counsel joined in the objection and moved for a mistrial on the ground that the testimony regarding "the urination" and "the 100 blows" was an end run around the *Aranda–Bruton* rule. Alternatively, he requested the court "admonish the jury about *Aranda–Bruton* and tell them this can only be used against Mr. Gray and not Mr. Taylor. . . ."

The trial court was unwilling to concede that there had been an *Aranda–Bruton* violation, noting that Gray's redacted statements did not obviously refer to Taylor. The court did, however, acknowledge that "the jury might . . . believe that Taylor's being referred to . . . because of prior evidence they've heard in the case from one or more percipient witnesses who have, in fact, testified that Taylor, not Gray, . . . urinated on [Smith] and took property from him . . . .," and thus, instructed the jury as follows: "The Court is sustaining a defense objection to Officer Cogle's statements about what Mr. Gray said during his interview with Officer Cogle insofar as the following topics: One, whether any property was taken from Travis Smith; and two, whether any person urinated on Travis Smith. You must rely upon the testimony of other witnesses, if any at all, before concluding that either of these events took place and/or whether either of the defendants took part in either of these events and/or were even present when and if these events took place." The trial court concluded that its instruction was "more than adequate because any bell that's been rung has already been rung a thousand times or quite a bit, . . . [by] other witnesses and other independent admissible evidence." The court denied Taylor's motion for a mistrial.

When Officer Cogle retook the stand, he testified in pertinent part as follows:

"Q. Okay. Did Mr. Gray tell you that after the second time that he saw Travis Smith he noticed Travis Smith's condition when he left?

"A. Yes.

"Q. Okay. And if I could just show you page 26, the last line, can you read what his response was?

"[¶] . . . [¶]

"A. Oh, yeah.  He was talking, but I mean he was fucked up, dude.  I ain't going
to lie to you.  He was fucked up.
"Q. And those were Mr. Gray's words?
"A. Correct.
"Q. And that pertains to the second occasion that night that he went to Travis
Smith's location?
"A. Correct.
"Q. Was the other defendant, Mr. Taylor, arrested on that date, that same date?
"A. No.
"Q. Okay.  Why not?
"A. He left the jurisdiction."

After the close of evidence, and several days after Officer Cogle finished
testifying, the court instructed the jury in pertinent part: "You've heard evidence that
Defendant Beau Houston Gray made a statement out of court before trial to the police.
You may consider that evidence only against him, not against the other defendant."

*Taylor*, 2012 WL 928244, at *5-6.

The Confrontation Clause of the Sixth Amendment mandates that a criminal defendant

has the right to confront and cross-examine the witnesses against him.  *See Pennsylvania v.*

*Ritchie*, 480 U.S. 39, 51 (1987).  This generally means that out-of-court testimonial statements

by a witness are not admissible against a defendant unless the witness is available for

cross-examination at trial or the defendant had an opportunity to cross-examine the witness

about the statements before trial.  *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  This rule

applies with equal force to statements by a non-testifying accomplice or co-participant.  *See*

*Bruton*, 391 U.S. at 135-36 (holding that the admission of a statement of an accomplice or co-

participant that implicates a defendant violates the defendant's Sixth Amendment rights when

the defendant has no opportunity to cross-examine the co-participant).

Where, however, the accomplice's statement does not directly implicate the

defendant—i.e., the statement is "not incriminating on its face, and [becomes] so only when

linked with other evidence introduced later at trial"—the Constitution does not prohibit the

introduction of the statement.  *Richardson v. Marsh*, 481 U.S. 200, 208 (1987); *see also Mason v. Yarborough*, 447 F.3d 693, 695 (9th Cir. 2006) (noting that *Bruton* "specifically exempts a statement, not incriminating on its face, that implicates defendant only in connection to other admitted evidence").

Although the Court of Appeal declined to address whether a *Bruton* error occurred here, the record indicates that no such error occurred.  While *Bruton* forbids the admission of statements made by an accomplice that implicates the defendant, *Bruton*, 391 U.S. at 126, 135-56, the testimony here did not directly implicate Taylor in the criminal activity.  For the jury to infer that Gray implicated Taylor in his statement, the jury would have to rely on other evidence introduced at trial; the statement therefore falls outside of *Bruton*.  *See Richardson*, 481 U.S. at 208; *see also Mason*, 447 F.3d at 695.

In any event, a *Bruton* claim, like other Confrontation Clause claims, is subject to harmless error analysis.  *Lilly v. Virginia*, 527 U.S. 116, 139-40 (1999); *Harrington v. California*, 395 U.S. 250, 254 (1969).  The Court of Appeal rejected Taylor's *Bruton* claim on this ground, concluding that even if a *Bruton* error had occurred, such error was harmless.  It reasoned:

> At trial, numerous witnesses testified and Taylor admitted that he participated in the June 8, 2008, assault on Smith.  The evidence adduced at trial established that Taylor punched Smith in the face with such force that Smith was knocked to the ground.  Taylor twice returned to Smith's location and punched, slapped, and or kicked Smith in the face.  Taylor took money and methamphetamine from Smith.  Taylor urinated on Smith.
>
> Taylor disputes that the error was harmless based on "Gray's claim that a hundred blows rained down on Smith."  According to Taylor, the jury must have found him guilty of murder under an implied malice theory because he and Gray left Smith alive, and there was not overwhelming evidence of implied malice apart from Gray's statement concerning the 100 blows.  We disagree.
>
> "Second degree murder is the unlawful killing of a human being with malice aforethought, but without the premeditation, deliberation and willfulness necessary to

elevate the offense to first degree murder. [Citation.] 'Generally, the intent to unlawfully kill constitutes malice.' [Citation.] Express malice murder requires an intent to kill. [Citations.] Implied malice murder requires 'an intent to do some act, the natural consequences of which are dangerous to human life. "When the killing is the direct result of such an act," the requisite mental state for murder—malice aforethought—is implied.' [Citation.]" (*People v. Bohana* (2000) 84 Cal. App. 4th 360, 368.)

Assuming for argument's sake that the jury based its second degree murder verdict on a finding of implied malice, as Taylor claims, the evidence to support such a verdict was overwhelming without Gray's statement that Smith sustained 100 blows. Taylor participated in the assault on Smith during which Smith was punched in the face with such force that he was knocked to the ground, and his head was stomped on. During the assault, Smith was rendered unconscious only to be awakened and beaten again. Following the assault, Taylor left Smith outside overnight despite his obvious injuries and warned others not to call for help. As a result of the assault, Smith sustained a traumatic brain injury. The nature of Smith's injuries, the brutality of the beatings, and defendants' decision to ignore Smith's injuries provide overwhelming evidence of implied malice. On this record, any potential *Aranda–Bruton* error was harmless beyond a reasonable doubt.

*Taylor*, 2012 WL 928244, at *9.

Applying the *Brecht* standard here, this Court must agree. As the Court of Appeal noted, there was not only substantial, but in fact overwhelming evidence that established Taylor's guilt of the offenses charged. Based on the evidence adduced at trial, it is inconceivable that the jury would or could have reached a different verdict as to Taylor in the absence of Gray's statement. It therefore cannot be said that the admission of Gray's statement had a substantial or injurious effect or influence on the jury's verdict, and he is not entitled to relief on this ground.

C.     *Ineffective Assistance of Counsel* (Grounds 3 through 9)

Taylor further argues that his trial counsel was ineffective for a number of reasons.

1.     *Strickland* standard on federal habeas review

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Taylor must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

2.      Claims relating to Ground 1 and 2 (Grounds 3, 9)

Taylor first argues that, related to his previous two grounds, trial counsel was ineffective for failing to object to the *Aranda/Bruton* error and failing to request a separate instruction on independent intervening causation.  But as detailed above, no prejudice resulted from the trial court's alleged *Bruton* or instructional error.  Thus, Taylor cannot show that counsel was ineffective with respect to these claims, and he is not entitled to relief on those grounds.  *See Strickland*, 466 U.S. at 687-88 (counsel has no obligation to raise meritless arguments, and petitioner cannot prevail where no prejudice resulted from counsel's alleged error); *Madayag v. Evans*, 442 F. App'x 354, 355-56 (9th Cir. 2011) (counsel not ineffective for failing to request jury instruction where there was no evidence to support it); *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (failure to raise a meritless argument does not constitute ineffective assistance).

24

3.      Failure to investigate alibi defense (Ground 4)

Taylor additionally argues that trial counsel was ineffective because he failed to investigate and call two alibi witnesses.  Taylor raised this claim in his state habeas petition to the California Supreme Court, which was summarily denied without an evidentiary hearing.

Under *Strickland*, defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  However, "the duty to investigate and prepare a defense is not limitless: it does not necessarily require that every conceivable witness be interviewed." *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995) (citations omitted).  Furthermore, "ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case." *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (citation omitted).

In support of this claim, Taylor attaches two declarations.  The declaration of Charles Lee Taylor states that, "[o]n or about June 9, 2008, Curtis Wayne Taylor was inside the attached laundry room of my place of residence between the hours of 4:30 am and 7:15 am."  The declaration of Larry Folkes is nearly identical and states that, "[o]n or about June 9, 2008, Curtis Wayne Taylor was inside the laundry room between the hours of 3:00 am and 7:00 am."  Taylor claims that the testimony of these witnesses would have shown that he was not present for any attacks that took place after 3:00 a.m. as well as impeached T.D.'s testimony that Taylor returned to the scene of the crime the following morning to clean up blood evidence.

These declarations, however, are insufficient to warrant relief.  The testimony at trial established that there were at least two beatings with the first beginning at around 9:00 to 9:30 p.m. on June 8, 2008, and the second beating taking place 30-40 minutes later.  Those beatings

thus took place well before 3:00 a.m., and Taylor does not contest his presence at those.  T.D. also testified that a third and fourth beating took place, in both of which Taylor participated. While he argues in his Petition that he was not at the third beating, T.D. testified that it occurred only 20 minutes after the second beating and thus prior to 3:00 a.m.  The declarations therefore do not provide an alibi with regard to that beating.  Taylor also argues that the fourth beating involved only Gray.  But Taylor does not establish that the alleged fourth beating took place after 3:00 a.m. either (particularly given that the earlier beatings occurred much earlier in the night) or that this beating, and not the previous beatings, led to Smith's death, and thus the declarations do little to help Taylor's case.  Likewise, the proposed testimony and declarations themselves are of dubious value as they do not explain why they or Taylor were in a laundry room in the early hours the morning.  *C.f. Cervantes v. McEwan*, 446 F. App'x 927, 928 (9th Cir. 2011) (counsel not constitutionally ineffective for failing to call alibi witnesses when counsel "could have made the strategic determination that their testimony would have been so implausible as to undermine [petitioner's] defense").  And given that Charles Lee Taylor shares a surname with the petitioner, counsel may have believed that his testimony would be viewed with suspicion.  *See Stoval v. Tilton*, No. CV 07-3105, 2011 WL 2939423, at *23 (C.D. Cal. June 10) ("counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias" (citation and internal quotation marks omitted)), *accepted by* 2011 WL 2939420 (C.D. Cal. Jul.19, 2011).  It was therefore a reasonable tactical decision on counsel's part not to call Taylor and Folkes but to instead focus on the defense that Smith's drinking and Fentanyl use was the true cause of his death.  *See United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) (per curiam) (a decision not to call a witness based

26

upon sound logic and tactics does not constitute ineffective assistance of counsel); *Morris v. California*, 966 F.2d 448, 456 (9th Cir. 1991) (a tactical decision not to call a particular witness cannot form the basis of an ineffective assistance of counsel claim, even if the defendant disagrees with the decision).

For the same reasons that he cannot demonstrate deficient performance, Taylor cannot show that he was prejudiced by counsel's failure to call the witnesses. Furthermore, given the overwhelming strength of the evidence against Taylor and the weakness of the proposed testimony, Taylor fails to establish that the result of the proceeding would have been different had Taylor and Folkes testified. Accordingly, Taylor cannot prevail on this claim.

    4.    Failure to object to prosecutor's statement regarding reasonable doubt (Ground 5)

Taylor also faults counsel for failing to object to the prosecutor's erroneous statements during closing argument regarding the reasonable doubt standard. On direct appeal, the Court of Appeal summarized the facts of this claim as follows:

> Before closing arguments, the trial court instructed jurors in pertinent part as follows: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt. In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial." The court also instructed jurors that they must follow the law as explained by the court, and to the extent the attorneys' comments on the law conflict with the court's instructions, jurors must follow the court's instructions.
>
> At the beginning of his closing argument, the prosecutor reminded the jury that "the law itself . . . comes from one person, and that's the judge" and cautioned the jury to "go with what [the judge] told you and not what I'm telling you" in the event the prosecutor's comments contradicted the court's instructions. The prosecutor then proceeded to discuss each of the charges, the applicable law, and the credibility of the key witnesses. He did not mention reasonable doubt.
>
> During his closing argument, Gray's counsel also reminded the jury that the law as instructed by the court "is the correct interpretation of the law . . . ." Later, Gray's counsel turned to the reasonable doubt standard, telling the jury that although the

27

instruction had recently been re-written it was still "very confusing."  He explained that while he could not tell jurors they must "be a certain percent sure," he could tell them that they "better be really, really sure."

The prosecutor responded in his rebuttal, noting that while the beyond a reasonable doubt standard is a "high standard," "it is the same standard of proof that's used to convict everyone in every courtroom in this building . . . .  It's not this impossible burden.  It's not proof beyond all reasonable doubt or any possible doubt or any shadow of a doubt."  He then provided jurors with his "interpretation" of how he wanted them to look at reasonable doubt: "It has to be a doubt with a reason behind it.  You can't just say things just don't add up here.  Something just doesn't seem right.  It's got to be doubt with a reason where you can articulate it to the other jurors . . . .  It has to be a doubt with a reason behind it."  He explained that it is possible to have doubts about anything, including whether the sun is going to rise in the morning and stated, "It's not a reasonable doubt that of all days tomorrow the sun isn't going to rise after all these thousands of years.  It has to be doubt with a reason."

The prosecutor then likened the way jurors should look at reasonable doubt to a jigsaw puzzle of the Golden Gate Bridge that is missing a few pieces.  In his example, a juror purchases a puzzle of the Golden Gate Bridge, realizes it is missing pieces, but decides to put it together anyway.  When he finishes the puzzle, he says, "Hey.  It's just like the picture on the box.  That's the Golden Gate Bridge."  Even though there is a piece missing from the tip of the north bridge tower, another from the toll plaza, and a couple from the sky, he "can say beyond a reasonable doubt that's the Golden Gate Bridge."  He could not, however, "say beyond any doubt whatsoever or beyond a shadow of a doubt that that's the Golden Gate Bridge because somewhere some place [there] could be an identical shaped orange bridge except on that bridge . . . the tip of the north tower where your piece is missing could be purple . . . ."

Finally, the prosecutor urged jurors not to leave their common sense behind when they deliberated.  In doing so, he acknowledged that while "[t]his a serious decision," "you reason it the same way as you make any serious decision in your own life, like buying a house.  You wouldn't just say I'm going to buy that house up on the hill because it has a great view.  You have to say, I really like that house, but let's see how much they're asking and how much of a mortgage can I afford . . . .  You put all these things together and reason it out and come to a decision.  You don't base it on, like one thing."

*Taylor*, 2012 WL 928244, at *13-14.

Taylor argued before the Court of Appeal that the prosecutor committed misconduct because his statements trivialized the reasonable doubt standard.  The Court of Appeal concluded that Taylor had forfeited his claim by failing to timely object before the trial court and

28

alternatively rejected the claim on the merits. *Id.* at *13.  The appellate court further denied

Taylor's related claim that trial counsel was ineffective for failing to object. *Id.* at *14.

Perhaps recognizing that the Court of Appeal's adjudication of his prosecutorial

misconduct claim on procedural grounds bars that claim here, Taylor raises in his Petition only

his claim that counsel was ineffective for failing to object to the prosecutor's statement.  But

Taylor's ineffective assistance of counsel claim fares no better on federal habeas review.  In

rejecting the prosecutorial misconduct claim on its merits, the Court of Appeal reasoned:

> The prosecutor's comments, in context, did not dilute or mislead jurors
> concerning the standard of proof.  Although in the abstract the statement, "It's got to be
> doubt with a reason where you can articulate it to the other jurors" could be interpreted to
> mean that a juror could not find reasonable doubt unless he or she could supply a reason
> for the doubt, in context it is clear the statement was made in response to Gray's
> counsel's argument that beyond a reasonable doubt requires jurors be "really, really
> sure," and that the prosecutor's point was that the standard contemplates reasonable
> doubt, not any possible doubt.
>
> Nor, in context, do we believe the jury would interpret the jigsaw puzzle analogy
> to mean that jurors were free to guess or jump to a conclusion as defendants suggest.
> Unlike the prosecutor in *People v. Katzenberger* (2009) 178 Cal. App.4th 1260, cited by
> defendants, the prosecutor here did not suggest a specific quantitative measure for
> reasonable doubt or invite the jury to guess or jump to a conclusion.  (*Id.* at pp.
> 1267–1268 [prosecutor argued, with use of a Power Point presentation showing six of
> eight pieces of a Statue of Liberty puzzle, that reasonable doubt standard had been met].)
> Rather, he was attempting to illustrate the difference between reasonable doubt and any
> doubt whatsoever.
>
> Nor would the jury have understood the prosecutor's remark that "you reason it
> the same way as you make any serious decision in your own life, like buying a house" as
> lowering the prosecutor's burden of proof.  Rather, the prosecutor's point, consistent with
> the court's instructions, was that in making its decision, the jury must "consider all the
> evidence" and not "base it on, like one thing."
>
> Counsels' closing arguments and the court's jury instructions "unambiguously
> communicated to the jury that the prosecution had the burden of proving every element
> of the case beyond a reasonable doubt.  The record does not demonstrate that the
> prosecution employed deceptive or reprehensible methods to persuade the jury, and, in
> light of the entire record there was no reasonable likelihood that the jury erroneously
> construed the prosecution's burden of proof."  (*People v. Samayoa* (1997) 15 Cal. 4th
> 795, 842.)

Even if we agreed the prosecutor overstepped the bounds of permissible argument, such error did not cause any prejudice.  The trial court instructed the jury to follow the law as given by the trial court, not the attorneys, and both the prosecutor and Gray's counsel reiterated that point in their closing arguments.  If the jury interpreted the prosecutor's remarks as describing a lower standard of proof, there is no reason to believe it would have followed that standard rather than the standard given by the trial court.  We presume the jury would follow the trial court's instructions, including the instruction to disregard those statements of the law given by attorneys that conflicted with the instructions.  (*People v. Sanchez* (2001) 26 Cal. 4th 834, 852.)

*Taylor*, 2012 WL 928244, at *14.

The appellate court's reasoning as to why the statements did not constitute misconduct and did not, in any event, prejudice Taylor is both entirely reasonable and fully supported by the record.  Thus, for the same reasons thoroughly and persuasively articulated by the Court of Appeal, Taylor fails to show that trial counsel was deficient for failing to object or that he was prejudiced by the failure.  Taylor is therefore not entitled to relief on this claim.

5.      Stipulation to "Statement of Case" (Ground 6)

Taylor further asserts that counsel was ineffective for stipulating to the statement of the case read to prospective jurors.  The Court of Appeal rejected this claim on direct appeal as follows:

Turning first to the stipulation of the case read to prospective jurors, defendants take issue with the following statement: "Shasta County Coroner's Office ruled [Smith] died from blunt-force trauma to the head."  Defendants claim this statement was erroneous because the coroner ruled that blunt force trauma combined with Smith's consumption of alcohol and drugs following his release from the hospital caused Smith's death, and absent the error "there likely would have been no jury finding that the defendants caused Smith's death."  Not so.

Immediately prior to reading the statement of the case, the trial court expressly reminded the jury that "I'm not providing you with any evidence on this case.  None of these comments I'm making right now are to be considered by you as evidence in the case.  Only evidence that takes place during the course of the trial are facts that we want you to consider in reaching the decisions that you need to reach at the end of the trial . . . . None of this is to be considered by you as evidence."  Given the court's admonition, we find it extremely unlikely that the jury disregarded the evidence at trial that Smith's

30

> consumption of alcohol and Fentanyl contributed to his death.  Moreover, as previously discussed, no reasonable jury could conclude that defendants' assault was not a concurrent or substantial cause of Smith's death.  Accordingly, defendants cannot establish they were prejudiced by counsels' stipulation to a statement of the case that failed to mention that Smith's consumption of alcohol and Fentanyl contributed to his death.

*Taylor*, 2012 WL 928244, at *17.

Again, the Court of Appeal's conclusion that Taylor suffered no prejudice from counsel's stipulation is entirely reasonable and supported by the record.  Taylor thus cannot prevail on this ineffective assistance claim either.

6.      Failure to object to prosecution's definition of voluntary manslaughter (Ground 7)

Taylor further argues, as he likewise did on direct appeal, that counsel was ineffective for failing to object when the prosecutor stated "that voluntary manslaughter involves a situation so emotional and provocative that 'almost anybody faced with that situation probably would have resorted to killing.'"  *Taylor*, 2012 WL 928244.  The appellate court rejected the claim for the following reasons:

> In *Najera*, the court determined that the prosecutor had misstated the legal standard of provocation by arguing that the law required a reasonable person to have killed under the circumstances.  (138 Cal. App. 4th at p. 223.)  The court explained, "An unlawful homicide is upon ' "a sudden quarrel or heat of passion"' if the killer's reason was obscured by a ' "provocation" ' sufficient to cause an ordinary person of average disposition to act rashly and without deliberation.  [Citation.]  The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly."  (*Ibid*.)
> Even if some of the prosecutor's comments during opening statements in this case misstated the legal standard of provocation, the jury was subsequently instructed in pertinent part as follows: "A person acts in the heat of passion when he or she is provoked into doing a rash act under the influence of intense emotion that obscures his or her reasoning or judgment.  The provocation must be sufficient to have caused a person of average disposition to act rashly and without due deliberation."  The jury was also instructed that it must follow the law as explained by the court, and to the extent the attorneys' comments on the law conflict with the court's instruction, the jury must follow the court's instructions.  During closing arguments, both the prosecutor and Gray's

31

counsel reminded the jury that it must follow the law as explained by the court and not counsel.  We presume the jury would follow the trial court's instructions, including the instruction to disregard those statements of the law given by attorneys that conflicted with the instructions.  (*People v. Sanchez*, *supra*, 26 Cal. 4th at p. 852.)  On this record, defendants failed to establish they were prejudiced by counsels' failure to object to the prosecutor's alleged misstatement of the law of provocation during opening statements.

*Id*. at *17.

As previously discussed, under federal law, just like California law, this Court must assume in the absence of evidence to the contrary that the jury followed its instructions.  *Weeks*, 528 U.S. at 234; *Richardson*, 481 U.S. at 206.  Based on a review of the record and the instructions given, this Court also concludes that Taylor cannot show that he was prejudiced by counsel's failure to object to the statement.  He is therefore not entitled to relief on this claim.

7.     Denial of right to testify (Ground 8)

Finally, Taylor contends that his trial counsel denied him of his right to testify on his own behalf.  In support of this claim, Taylor alleges:

At the conclusion of Officer Cogle's testimony, I told [trial counsel] I wanted to testify on my own behalf.  [Trial counsel] told me I could not testify.  If I did he could not help me.  My understanding was that if I testified I would be without counsel.  Had I been allowed to testify, I would have rebutted Officer Cogle's testimony that the victim received 100 blows.  Specifically, in the first assault I only hit the victim one time in the face.  In the second assault I only slapped the victim once.  My testimony would have also rebutted the testimony of a minor (T.D.) who first told police the victim was hit or kicked 20 or 25 times apiece by my person and my co-defendant but then told the jury that I had returned for a third assault where the victim was kicked 5 or 6 times and one a fourth occasion to have her kick the victim.

The right of an accused to testify in his own defense is well established and is a "constitutional right of fundamental dimension."  *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993); *see Rock v. Arkansas*, 483 U.S. 44, 51 (1987).  The right stems from several provisions of the Constitution, including the Fourteenth Amendment's Due Process Clause, the

Sixth Amendment's Compulsory Process Clause, and the Fifth Amendment's privilege against self-incrimination. *Rock*, 483 U.S. at 51-52. The right is personal, and "may only be relinquished by the defendant, and the defendant's relinquishment of the right must be knowing and intentional." *Joelson*, 7 F.3d at 177.

However, while waiver of the right to testify must be knowing and voluntary, it need not be explicit. *See id.* Rather, a defendant is "presumed to assent to his attorney's tactical decision not to have him testify." *Id.* "[W]aiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so." *Id.* A defendant who wishes to reject his attorney's advice and take the stand may do so "by insisting on testifying, speaking to the court, or discharging his lawyer." *Id.* When a defendant remains "silent in the face of his attorney's decision not to call him as a witness," he waives the right to testify. *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993).

The record here is clear that Taylor did not insist on testifying, and aside from Taylor's own statements in his Petition to the contrary, there is no evidence in the record that trial counsel somehow prevented Taylor from either testifying or speaking to the court about his desire to testify. In any event, Taylor cannot show prejudice.[7] Numerous witnesses identified Taylor as

---

[7]  Taylor's claim alleges only that his counsel was ineffective for failing to secure his right to testify which is subject to the prejudice prong of *Strickland.* Taylor does not contend that the trial court deprived him of his right to testify. Where a federal criminal defendant is denied his constitutional right to testify, the Ninth Circuit has suggested that such denial constitutes structural error under which error may not be deemed harmless. *See United States v. Gillenwater*, 717 F.3d 1070, 1083 (9th Cir. 2013). Even construing Taylor's Petition to raise a claim that he was denied of his constitutional right to testify, Taylor cannot prevail because, as discussed above, his silence waived his right to testify. And in any event, Taylor's right to testify claim would still fail on *Brecht* harmless error review. *See Parle v. Runnels*, 387 F.3d

participating in the multiple beatings of Smith.  Taylor provides no reason to believe that, in spite of the testimony to the contrary, the jury would have found credible Taylor's proposed testimony that he hit Smith only one time in the face during the first beating, slapped him once during the second assault, and did not participate in the third and fourth beatings.  Indeed, even with the more limited participation, Taylor may nonetheless have been convicted of the second-degree murder on an aiding and abetting theory.

And for the same reasons, it cannot be said that trial counsel's advising Taylor to refrain from testifying, which likely prevented the prosecution from impeaching him with extremely damaging evidence, was an unreasoned tactical decision.  This is particularly true given that focusing the jury on his participation in the assault may have adversely impacted the stronger defense that Smith's drinking and Fentanyl use caused his death.  Accordingly, because Taylor has failed to show that the decision of the California Supreme Court was contrary to clearly established federal law or involved an unreasonable determination of the facts, he is not entitled to relief on this ground.

---

1030, 1042-45 (9th Cir. 2004) (applying *Brecht* harmless error test to § 2254 claim that state trial court infringed upon petitioner's right to testify).

C.    *Evidentiary hearing*

Taylor requests an evidentiary hearing on all claims.  However, he has failed to specify what evidence he wishes to present for each claim.  A district court may not hold an evidentiary hearing on a claim for which a petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).

Where the failure to develop the factual basis for the claim in the state court proceedings is not attributable to the petitioner, to receive an evidentiary hearing, the petitioner must make a colorable claim for relief and meet one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963).  *Insyxiengmay v. Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005).  In *Townsend*, the Supreme Court concluded that a federal habeas petitioner is entitled to an evidentiary hearing on his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.  *Id.* at 670

(quoting *Townsend*, 372 U.S. at 313), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

As discussed above, Taylor has failed to assert a colorable claim for relief as to any of his claims.  Because Taylor does not cite to new laws or underlying facts that were not developed on the record before the state courts with respect to those claims, he has failed to satisfy his burden of proof under 28 U.S.C. § 2254(e)(2).  Accordingly, Taylor's request for an evidentiary hearing must also be denied.

## V. CONCLUSION AND ORDER

Taylor is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the request for an evidentiary hearing is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: August 3, 2015.

        /s/James K. Singleton, Jr.
     JAMES K. SINGLETON, JR.
     Senior United States District Judge

37